IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **V.** | : | **CRIMINAL NUMBER 19-285-1** |
| | : | |
| **MARSHALL BROOKS** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM AND
### MOTION FOR DOWNWARD VARIANCE

Marshall Brooks, by and through his counsel, Katrina Young, Assistant Federal Defender, and Catherine Henry, Senior Litigator, submits this memorandum to aid the Court in imposing a just sentence in this case. Mr. Brooks has pled guilty to two counts of armed bank robbery in violation of 18 U.S.C. § 2113(d) and four counts of Hobbs Act robbery in violation of 18 U.S.C. § 1951(a), and he fully accepts responsibility for these crimes. These crimes were committed in Bucks County, Pennsylvania during a two-week period in December 2018 and a one-week period in February 2019 in which Mr. Brooks was experiencing manic episodes brought on by his longstanding Bipolar Disorder[1] as well as his use of cocaine and amphetamines. Due to the significant role Mr. Brooks's untreated addiction and mental illness played in his commission of these crimes, his receptivity to treatment, and related arguments presented herein, the defense submits that a sentence below the recommended guideline range is warranted. Specifically, the defense submits that a sentence of 96 months is appropriate in this case.

---

[1] Bipolar Disorder is a mood disorder characterized by alternating depressive and manic episodes. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, pp. 123-39 (Am. Psychiatric Ass'n 5th ed.) (2013). People who live with Bipolar Disorder cycle between periods of extreme excitement, overactivity, delusions, sleeplessness, and euphoria (known as mania) and periods of feeling extremely sad and hopeless (known as depression). Id.

1

I.      **PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

In November 2018, Mr. Brooks was released from Pennsylvania state prison with no reentry plan, no mental health treatment plan, and nowhere to live. By December, stressed about not being able to find a decent job, uninsured, and living in a cheap hotel, Mr. Brooks became extremely depressed. Feeling hopeless, he began self-medicating with cocaine and amphetamines, which quickly sent him spiraling into a manic episode.[2] He spent the latter part of December 2018 not sleeping for days on end, experiencing racing thoughts and behaving erratically, and admittedly using stimulants in an effort to fend off the inevitable depression that always follows the episodes of mania. Impaired by the manic symptoms of Bipolar Disorder—a mental illness from which Mr. Brooks has suffered for over 35 years—and in the throes of addiction, he committed three robberies with a fake gun in short succession between December 14, 2018 and December 31, 2018. In January, he slowed his drug use sending him into a severe depression during which he felt hopeless, inadequate, and considered killing himself. He again self-medicated with cocaine and amphetamines, which by February 2018 sent him into his second manic episode in just three short months. Again, severely sleep-deprived and thinking only about how to quickly obtain money for drugs, Mr. Brooks committed three more robberies with a fake gun between February 7, 2019 and February 13, 2019.

On February 15, 2019, Mr. Brooks was arrested by Bensalem Township Police. He willingly provided a DNA sample to the officers and told them he wanted to plead guilty for the crimes he had committed. After waiving his *Miranda* rights he agreed to undergo a videotaped

---

[2] Between 30-50 percent of people with Bipolar Disorder develop a substance use disorder. U.S. Dep't of Health and Human Services, Substance Abuse and Mental Health Services Administration. *An Introduction to Bipolar Disorder and Co-Occurring Substance Use Disorders.* (Summer 2016, Vol. 15, Issue 2). Use of central nervous system stimulants, such as cocaine and amphetamines, can produce and/or exacerbate manic symptoms, including euphoria, increased energy, grandiosity, impulsivity, and paranoia. Id. Withdrawal from these substances often produces depression symptoms, including apathy, anhedonia, and thoughts of suicide. Id.

interview during which he admitted to committing the six robberies with a "prop gun," which he purchased at Dick's Sporting Goods for $39.00. He adamantly denied any desire to cause harm to the bank and store employees. Despite the officers' questioning whether the robberies were motivated by drug use, Mr. Brooks stated simply that they were "all about money" because he "just spend[s] money." His speech and behavior during this interview, however, shed significant light on and are corroborative evidence of the mental health crisis and drug binge he had undergone in the months leading up to his arrest. During most of the interview, Mr. Brooks kept his forehead on the table in front of him and at times spoke unintelligibly. He repeatedly fell asleep midsentence and had to be aroused by the interrogating officers in order to continue the interview, and it was only after they gave Mr. Brooks a bag of potato chips that he was able to stay awake. Even during the most lucid portion of the interview he nevertheless had difficulty keeping his eyes open and spoke with them closed. One need look no further than this videotaped interview to witness the physical manifestation of Mr. Brooks's mental illness and addiction firsthand.

Mr. Brooks makes no excuses for his conduct and accepts that this Court must impose a significant period of incarceration in order to serve the statutory goals of 18 U.S.C. § 3553(a). Yet the undeniable relationship between his addiction, mental illness, and criminal conduct cannot be discounted in determining the appropriate sentence. Indeed, were it not for having Bipolar Disorder and becoming addicted to hard drugs in an effort to self-medicate, or had Mr. Brooks had meaningful intervention early into his illnesses, Mr. Brooks's life thus far would have undoubtedly been different. Therefore, for the reasons cited herein, Mr. Brooks respectfully requests the Court exercise its discretion and impose a sentence of 96 months on Counts One through Six to run concurrently, as well as a period of supervised release that

includes the condition of addiction and mental health treatment. Such a sentence is sufficient, but not greater than necessary, to serve the statutory goals of sentencing for Mr. Brooks.

## II. MARSHALL BROOKS'S PERSONAL HISTORY

At 54 years old, Mr. Brooks's life has been plagued by a cycle of severe mental illness, addiction, trauma, poverty, and incarceration. One of six children, he "was raised in a family that ignored mental health concerns" and the presence and impact of traumatic events.[3] See November 12, 2019 Report of Dr. Gillian Blair, Ph.D., p. 4, attached hereto as Exhibit A. His father was emotionally unavailable and physically abusive towards his children "even for minor infractions," and Mr. Brooks lived in constant fear of his father throughout childhood. Id.; Presentence Report (PSR) ¶ 100. When he was just 12 years old, his father beat him severely for smoking a cigarette. Exhibit A at p. 3. By age 16, Mr. Brooks began running away from home to escape his father's wrath, and he left his parents' home permanently by age 17. PSR ¶ 101. The next year, Mr. Brooks experienced his first manic episode during which he had racing thoughts, felt "out of control," and was unable to sleep for an entire week. Exhibit A at p. 4. "Confused, disoriented[,] and incoherent," he was involuntarily committed for three days and ultimately diagnosed with Bipolar Disorder.[4] Id.; PSR ¶ 114. Still a teenager and ill-equipped to confront this harsh reality and with no support or guidance from his family, Mr. Brooks stopped taking his prescribed medication upon feeling stable.[5] Exhibit A at p. 4. Unsurprisingly, his psychiatric symptoms returned, and he self-medicated with amphetamines, cocaine, and

---

[3] In addition to physical and emotional abuse by his father, Mr. Brooks experienced a number of traumatic childhood events, the impact of which he tends to minimize, including sexual abuse by his older brother and the accidental drowning death of his best friend. See Exhibit A at p. 6.
[4] Notably, this hospitalization coincides with Mr. Brooks's first criminal conviction. See PSR ¶ 76.
[5] "Those with bipolar disorder often discontinue medication once their mood is stabilized, leading to further episodes of mania and depression." Exhibit A at p. 9.

methamphetamine. Id. at p. 5; PSR ¶ 114. At just 19 years old, Mr. Brooks was convicted of robbery, and he spent the next six and a half years in state prison. PSR ¶ 77. Upon his release, he was again hospitalized at a psychiatric facility—this time for approximately two weeks—after experiencing another severe manic episode. PSR at ¶ 115; Exhibit A at p. 4. Not long after his release from the hospital, Mr. Brooks again found himself psychiatrically unstable, using drugs, and back in prison. Exhibit A at p. 4-5; PSR ¶¶ 114-24. This tragic cycle has been Mr. Brooks's reality for the majority of his adult life and is the backdrop against which this Court must view the conduct for which he awaits sentencing.

Despite this history, Mr. Brooks maintains a strong, supportive, loving relationship with his common law wife of 12 years, Tabitha Hayden, who also suffers from mental illness. See PSR ¶ 106. She states that despite his mistakes, Mr. Brooks has always been there for her and treated her well. He also maintains regular telephone contact with his adult son, Marshall Brooks, Jr., who lives in Colorado. PSR ¶ 102. Perhaps most telling of Mr. Brooks's character, however, is the information shared by Tina Cook—a longtime friend of Mr. Brooks—regarding their history and the type of person Ms. Cook has witnessed Mr. Brooks to be. See November 19, 2019 Email of Tina Cook attached hereto as Exhibit B. Writing from Brazil, Ms. Cook recalls that she met Mr. Brooks 15-20 years ago, and they became close friends. Id. She recalls that he worked for her as a painter and was reliable and hardworking. Id. She even allowed him to live with her temporarily upon his release from prison years ago and recalls that he was trustworthy and extremely respectful to her and her family. Id. Ms. Cook's experience and friendship with Mr. Brooks exemplify his true character notwithstanding of his dual diagnosis.

### III.     MARSHALL BROOKS'S REMORSE, RECEPTIVITY TO TREATMENT, AND CAPACITY FOR REHABILITATION

On October 17, 2019, Dr. Gillian Blair, Ph.D.[6] conducted a comprehensive psychological evaluation of Mr. Brooks. PSR ¶ 118; see Exhibit A. At that time, she concluded that "it was clear that he [wa]s experiencing a Major Depressive Episode[] consistent with his presentation, other test data[,] and his lengthy history of Bipolar Disorder."[7] Exhibit A at p. 7. She noted that his long psychiatric history—referenced in his Bureau of Prisons (BOP) medical records—substantiates his Bipolar Disorder diagnosis and that his "manic symptoms were noted to be considerably longer and more severe than [] periods of depressed mood." Id. at p. 5. The significant correlation between these episodes of severe mania and the crimes Mr. Brooks has committed "suggest[s] that he is vulnerable to exercising poor judgment during these periods[] while lacking the insight to control his impulses or appreciate his need for intervention [while manic]." Id. at p. 6. She also noted Mr. Brooks's historical struggle with coming to terms with his illness and the likely role this played in his sporadic treatment compliance throughout the years. Id. at p. 4.

In addition to his candidness regarding his mental illness, Mr. Brooks was also forthright with Dr. Blair about his substance abuse history and lack of addiction treatment. Id. at p. 5. Consistent with his presentence interview, he admitted that he began using cocaine and amphetamines in his late teens and used these substances daily during periods of non-incarceration throughout his life, including during the months leading up to his arrest in this case. Id.; PSR ¶ 122. Indeed, "he is fully cognizant that when in the community his drug use is out of

---

[6] Dr. Blair's curriculum vitae is attached hereto as Exhibit C.

[7] At the time of the evaluation, Mr. Brooks was taking Depakote as prescribed; however, he went untreated from April 2019 to July 2019, because he refused to take the previously prescribed medication due to its history of causing him kidney stones. Id. at p. 5. Due to a suicide attempt in December 2019, Abilify has been added to Mr. Brooks's medication regimen.

6

control." Exhibit A at p. 5. Though he does not characterize his drug use as "self-medication," it is nevertheless obvious that Mr. Brooks uses for this purpose given his admission that getting high is "a way to avoid the lows associated with Bipolar Disorder" because "'uppers ke[ep] the depression at bay.'" Id.

Most importantly, despite the evaluation's focus on his drug addiction and severe mental illness, Mr. Brooks did not shy away from accepting responsibility for his actions. He "readily acknowledged his crimes" and "did not apportion blame to anyone else." Id. at p. 6. He "recognized his need for treatment," "expressed regret and remorse," and "voiced his hope to have the time and opportunity to make amends." Id. at p. 7. "He is deeply saddened by the distress he has caused to those closest to him and those harmed by his actions." Id. It should be noted that Dr. Blair did not simply take Mr. Brooks's word for it when it came to his purported remorsefulness; rather, she administered scientific testing whose results necessitate her conclusion that he recognizes a need for and would be receptive to treatment and that his statements "reflected deeply held feelings of remorse, regret[,] and sorrow for the pain he has brought to others." Id. at p. 7-8.

### IV.     THE SENTENCING GUIDELINE RANGE

The base offense level for Counts One through Six is 20. PSR ¶¶ 27, 35, 42, 48, 54, 61. Mr. Brooks objects to the United States Probation Officer's application of the four-level enhancement under U.S.S.G. § 2B3.1(b)(4)(A) for "abduction" for Counts One and Five. PSR ¶¶ 30, 56.[8]

---

[8] Mr. Brooks withdraws his initial objection to the United States Probation Officer's application of U.S.S.G. § 2B3.1(b)(2)(D).

### A. The Four-Level Enhancement Under U.S.S.G. § 2B3.1(b)(4)(A) Does Not Apply as the Victims were not Abducted

The facts underlying Counts One and Five do not support the abduction enhancement pursuant to § 2B3.1(b)(4)(A). "'Abducted' means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction." U.S.S.G. § 1B1.1, cmt. n. 1(A). The main purpose of this abduction enhancement is "to protect victims against the additional harm that may come to them by virtue of their isolation." United States v. Reynos, 680 F.3d 283, 287 (3d Cir. 2012), *reh'g en banc granted*, *opinion vacated,* 682 F.3d 1053 (3d Cir. 2012), and *opinion reinstated*, 700 F.3d 690 (3d Cir. 2012). Imposition of the four-level increase in the base offense level for abduction therefore requires the government to prove: (1) a robbery victim was forced to move from their original position or change location, such force being sufficient to permit a reasonable person to infer that they were not at liberty to refuse; (2) the victim accompanied the offender to that new location; and (3) the victim's relocation was for the purpose of furthering either the commission of the crime or the offender's escape. Id. at 286-87.

In this case, the government cannot meet the first prong of the Reynos test, as the victims in Counts One and Five were not forced to "change location." See id. at 290. While the Third Circuit in Reynos adopted a flexible approach to the meaning of "location," the Court recognized that within a single building or area, "the smaller the space, the more difficult it is to find a change in location." Id. Since Reynos, cases applying the abduction enhancement show the distinction between moving a few steps in the same room and moving to a completely different location or area. See United States v. Janqdhari, 755 Fed. Appx. 127, 131-32 (3d Cir. 2018) (employee taken from front of cell phone store to bathroom in rear of store to prevent calling for help); United States v. Styles, 659 Fed. Appx. 79, 84 (3d Cir. 2016) (unpublished) (victims

8

moved from first to second floor of residence).  The same may be seen in other Circuits.  Compare United States v. Archuleta, 865 F.3d 1280, 1288-89 (10th Cir. 2017) (adopting Reynos three-part test for proof of abduction and applying enhancement where bank manager and teller forced to accompany defendant from lobby area around corner and into separate enclosed vault area); with United States v. Whatley, 719 F.3d 1206, 1222 (11th Cir. 2013) (movement of bank employees inside branch bank did not constitute abduction, treating bank as single location).

Here, regarding Count One, the PSR states the abduction enhancement applies because "the defendant approached an employee's cubicle and at gunpoint ordered the employee to move to the teller counter…" PSR ¶ 30.  Regarding Count Five, the PSR applies the same enhancement because "the defendant ordered a store manager from his original location, specifically in an aisle in the store, to the front of the store…" PSR ¶ 56.  In each of these robberies, Mr. Brooks ordered the victims to move only a short distance from the middle of relatively small rooms in which each victim was located to the counters located at the front of those same rooms.  Unlike in Reynos and the other cases referenced above, the victims were not made to move from one distinct room to another within the same building, and neither of the victims was forced to move from or into a fully enclosed structure within the larger room or area.  The victims in each of these scenarios simply were not forced to "change location" within the meaning of Reynos's first prong; thus, the four-level abduction enhancement does not apply.

Moreover, in determining whether the abduction enhancement applies, it is helpful to compare the facts at issue here with those of cases in which only the two-level "physical restraint" enhancement under § 2B3.1(b)(4)(B) has been explored.  Logically, where the same guideline subsection provides for the application of enhancements for certain conduct during the commission of a robbery, the type of conduct to which a four-level enhancement applies must be

more egregious than the conduct to which only a two-level enhancement applies.  Put another way, the greater of two enhancements must apply to the more severe of the two categories of conduct to which those enhancements apply.

The physical restraint enhancement requires the application of an increase of two levels "if any person was physically restrained to facilitate commission of the offense or to facilitate escape." U.S.S.G. § 2B3.1(b)(4)(B). "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n. 1(A).  Factors to consider in determining whether the enhancement applies are:  (1) use of physical force; (2) exerting control over the victim; (3) providing the victim with no alternative but compliance; (4) focusing on the victim for some period of time, and (5) placement in a confined space.  United States v. Bell, 2020 WL 62872, at *8 (3d Cir. January 7, 2020) (holding physical restraint enhancement inapplicable where defendant grabbed store employee by neck, pointed replica firearm at him, threw employee to ground, and hit him in face with gun).  Compare United States v. Greenstein, 322 Fed. App'x 259, 266 (3d Cir. 2009) (applying physical restraint enhancement where defendant pointed gun at some victims and ordered them to sit on floor and cower under countertop and then herded others into backroom of restaurant where he directed them to enter large, walk-in freezer); United States v. Copenhaver, 185 F.3d 178, 180-81 (3d Cir. 1999) (physical restraint enhancement upheld where defendant entered inn, hit inn auditor over head with BB gun, forced auditor to move at point of gun from lobby into adjoining office, and then forced auditor to get into fireplace and enclosed it with screen).

There is no doubt that moving someone at point of BB gun from one room of a building into a completely separate room and then locking them into a fireplace or freezer within that other room is conduct far more likely to put them at risk of "additional harm that may come to

them by virtue of their isolation" than moving a person a few feet within the same room at point of BB gun.  Moreover, the conduct at issue in Copenhaver and Greenfield is objectively much worse than that involved in the robberies in Counts One and Five; yet the Court in those cases applied the physical restraint enhancement alone.  Finally, in light of Bell's new five-factor "totality of the circumstances" test for the applicability of the physical restraint enhancement, the two-level enhancement under § 2B3.1(b)(4)(B) is far more appropriate than the four-level enhancement under § 2B3.1(b)(4)(A) for the conduct at issue in Counts One and Five.

Consequently, should the Court grant Mr. Brooks's objection to the four-level enhancement under § 2B3.1(b)(4)(A) in full, the applicable guideline range would be 108-135 months; however, should the Court find that the conduct at issue rises to the level of physical restraint under § 2B3.1(b)(4)(B), the applicable range would be 121-151 months.

## V. A SENTENCE OF 96 MONTHS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE 18 U.S.C. § 3553(a) FACTORS

In light of all the information contained in Mr. Brooks's Sentencing Memorandum, a sentence of 96 months will be sufficient, but not greater than necessary, to achieve the sentencing goals of United States v. Booker, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a).

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

As discussed *supra*, Mr. Brooks has lived the last 35 years with Bipolar Disorder and has suffered the consequences of ignoring his mental health needs.  His unfortunate cyclical history detailed in Section II has brought Mr. Brooks to this juncture in his life, and at 54 years old he can no longer afford to ignore his very real need for dual diagnosis treatment.  He accepts that the Court will likely impose a sentence that will confine him to federal prison beyond his

60th birthday, which terrifies him considering his physical health issues and the early deaths of his father and sister. Though his mental illness is no fault of his own, he wholeheartedly accepts his responsibility in robbing two banks and four stores and putting the victims in extreme fear. The offenses he committed are undeniably serious and Mr. Brooks's criminal history is notable, yet they are fully explained by his chronic mental illness and addiction and are not the result of a cold-hearted desire to harm others or senseless thrill-seeking behavior. Given Mr. Brooks's history, age, and the undeniable reasons for committing these very serious offenses, a sentence of 96 months duly takes into consideration the nature and circumstances of the offenses and the history and characteristics of the defendant.

B. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of Mr. Brooks**

In eight years, Mr. Brooks will be 62 years old. Consequently, he is acutely aware of the fact that despite always having been released from prison after serving sentences in the past, this is the last opportunity he will have to pay his debt to society and again be free should the Court permit. As noted in Dr. Blair's report, Mr. Brooks has spent his pretrial incarceration ruminating about the very real possibility that he will die of cardiac disease like his father and sister[9] before he has the opportunity to serve out his sentence and "make amends." Exhibit A at p. 4, 7. A sentence of 96 months is therefore significant enough to reflect the seriousness of Mr. Brooks's offenses and, individualized to him, achieve the other sentencing goals of § 3553(a)(2)(A)—(C).

---

[9] Mr. Brooks's father and sister died of congestive heart failure at ages 62 and 58, respectively. Exhibit A at p. 3. In 2018, Mr. Brooks was diagnosed with a heart arrhythmia, which has been unmonitored since his arrest.

### C. The Need to Provide Mr. Brooks with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

While incarcerated, Mr. Brooks will require constant and extensive mental health and substance abuse treatment. Though Mr. Brooks would benefit greatly from the BOP's Residential Drug Abuse Program (RDAP), the nature of his offenses and his significant mental health issues likely preclude him from admission into the program. In light of his dual diagnosis treatment needs and willingness to participate in all available programming, the Court should recommend that he undergo dual diagnosis treatment while incarcerated. The Court should also impose as a condition of supervised release a dual diagnosis treatment requirement.

With respect to Mr. Brooks's medical issues—specifically, his heart arrhythmia and history of kidney stones—the Court should order that Mr. Brooks receive proper assessment and treatment while in the custody of the BOP. In particular, due to his documented family history of heart disease, Mr. Brooks should be monitored by a cardiologist.

## VI. CONCLUSION

For all of the reasons cited herein, as well as any which may become apparent to the Court at the sentencing hearing, Mr. Brooks respectfully requests the Court impose a sentence of 96 months of incarceration in this case.

*/s/ Katrina Young*
KATRINA YOUNG
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

We, Catherine Henry, Senior Litigator, and Katrina Young, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that we have electronically filed and served a copy of the Defendant's Memorandum in Aid of Sentencing, upon Priya DeSouza, Assistant United States Attorney, to her office located at 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania 19106.

*/s/ Katrina Young*
KATRINA YOUNG
Assistant Federal Defender

DATE:   January 13, 2019